WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Stacee Kensler Baxla,<br><br>                  Plaintiff,<br><br>v.<br><br>Carolyn W. Colvin,<br><br>                  Defendant. | No. CV-13-00733-PHX-BSB<br><br>**ORDER** |

Plaintiff Stacee Kensler Baxla seeks judicial review of the final decision of the Commissioner of Social Security (the Commissioner) denying her application for disability insurance benefits under the Social Security Act (the Act).  The parties have consented to proceed before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and have filed briefs in accordance with Local Rule of Civil Procedure 16.1.[1] For the following reasons, the Court affirms the Commissioner's decision.

## I.    Procedural History

On May 19, 2009, Plaintiff applied for disability insurance benefits under Title II of the Act alleging a disability beginning on October 27, 2007.  (Tr.13.)[2]  After the Social Security Administration (SSA) denied Plaintiff's initial application and her request for

---

[1]  Plaintiff also submitted a notice of supplemental authority citing a recent Ninth Circuit decision, *Garrison v. Colvin*, 2014 WL 3397218 (9th Cir. Jul. 14, 2014), which discusses the law applicable to review of the Commissioner's disability determination. (Doc. 32.)

[2]  Citations to "Tr." are to the certified administrative transcript of record. (Doc. 15.)

1    reconsideration, Plaintiff requested a hearing before an administrative law judge (ALJ).

2    After conducting a hearing, the ALJ issued a decision finding Plaintiff not disabled under

3    the Act.  (Tr. 13-22.)  This decision became the final decision of the Commissioner when

4    the Social Security Administration Appeals Council denied Plaintiff's request for review.

5    (Tr. 1); *see* 20 C.F.R. § 404.981 (explaining the effect of a disposition by the Appeals

6    Council.)    Plaintiff  now  seeks  judicial  review  of  this  decision  pursuant  to  42

7    U.S.C. § 405(g).

8    **II.    Medical Record**

9           The  record  before  the  Court  establishes  the  following  history  of  examination,

10   diagnosis, and treatment.  The record also include opinions from medical sources who

11   either examined Plaintiff or reviewed the record, but who did not provide treatment.

12          **A.    Treatment Related to Mental Health**

13          In October 2006, Plaintiff sought treatment at Value Options and was diagnosed

14   with bipolar disorder, depressive disorder, obsessive compulsive disorder, post-traumatic

15   stress disorder, and schizoaffective traits.  (Tr. 929.)  She continued treatment at Value

16   Options throughout 2006.  (Tr. 904-42.)

17          In March 2007, Plaintiff attempted suicide and was hospitalized for several days.

18   (Tr. 262.)  The emergency room report noted Plaintiff's diagnoses as bipolar disorder,

19   depression,  obsessive-compulsive  disorder,  and  thoughts  of  self-destructive  behavior.

20   (Tr. 262-64.)   In June 2007, Plaintiff continued receiving care at Value Options for

21   anxiety, paranoia, increased sleep, auditory hallucinations, and thoughts of self-harm.

22   (Tr. 877-78.)

23          Plaintiff  then  sought  treatment  at  Magellan  Health  Services  (Magellan).    On

24   November 29, 2007, Plaintiff was treated at Magellan for bipolar disorder.  (Tr. 859.)

25   She was instructed to contact the crisis line if she experienced an increase in auditory

26   hallucinations (hearing voices), anxiety, a desire to mutilate herself, or suicidal ideation.

27   (Tr. 859-860.)   Magellan's records include a July 30, 2008 annual assessment of

28   Plaintiff's care, which noted that Plaintiff received treatment for irritability and mood

cycling.  (Tr. 298.)  Plaintiff also reported some depression due to headaches, pain issues, and trouble sleeping.  (Tr. 298-99.)  She reported that she was on "medical leave" from her job and stated that she would probably be unable to return to work "due to the physical demands."  (Tr. 298.)  On examination, Plaintiff's mood was euthymic and sad, her affect was appropriate, her thought process was goal directed and coherent, she had good insight and judgment, and she denied having thoughts of self-harm.  (Tr. 299.)  Plaintiff continued treatment at Magellan throughout 2008.  (Tr. 727-42.)

On January 8, 2009, Plaintiff sought treatment at Southwest Network Direct Care Clinic (Southwest) for obsessive compulsive disorder (OCD) tendencies.  (Tr. 724.)  A mental status examination indicated that she was appropriately dressed, had a cooperative attitude, a euthymic mood, an appropriate affect, goal directed thought, no delusions or hallucinations, and no self-injury.  (Tr. 724-25.)  In addition, she was alert, had good concentration, grossly intact memory, but poor insight and judgment.  (Tr. 725.)  She was diagnosed with OCD, major depressive disorder, and panic.  (Tr. 724-25.)

On January 12, 2009, Plaintiff received treatment at Magellan for bipolar disorder.  (Tr. 303.)  She reported experiencing "a lot of anxiety."  (*Id.*)  On examination, Plaintiff's mood was appropriate, she had a logical thought process, and was cooperative.  (Tr. 303-04.)  She denied visualizations and hallucinations.  (Tr. 304.)  She reported that when she felt well she liked going places and spending time with her children or visiting her mother.  (Tr. 303.)  When Plaintiff was not doing well, she was tearful, slept a lot, and experienced an increase in hearing voices and anxiety.  (Tr. 304.)

On March 11, 2009, Plaintiff was treated at Southwest for "depressive symptoms of anxiety, isolation, fear of leaving home, [and] anhedonia."  (Tr. 719.)  A mental status examination indicated that her mood was depressed with a tearful affect.  (*Id.*)  Additionally, her appearance was appropriate, she was cooperative, her speech and motor activity were within normal limits, and she had a goal-directed thought process.  (Tr. 719.)  Plaintiff was also alert, had good concentration, grossly intact memory, good

1    insight and judgment, and no hallucinations or delusions.  (Tr. 720.)  She was diagnosed

2    with bipolar disorder and unspecified personality disorder.  (Tr. 719-20.)

3    　　　　On May 6, 2009, Plaintiff continued treatment at Southwest for "affective

4    reactivity anxiety, depression, [and] chronic low self-esteem." (Tr. 717.)  A mental status

5    examination reflected that her mood was depressed and her affect was neutral.  (*Id.*)  She

6    exhibited some paranoia, believing everyone was talking about her.  (*Id.*)  She was

7    prescribed Abilify to augment the Effexor that she was already taking.  (*Id.*)  She was

8    diagnosed with bipolar disorder and unspecified personality disorder.  (Tr. 717-18.)

9    　　　　Plaintiff was next treated at Southwest on June 3, 2009.  Plaintiff reported that her

10   depression seemed "a little better with the Abilify."  (Tr. 715.)  Plaintiff continued to

11   report having anxiety with panic attacks when she "had to leave home." (*Id.*)  Plaintiff

12   also worried about others and had poor sleep.  (*Id.*)  A mental status examination

13   reflected that Plaintiff's appearance was appropriate, her mood was depressed with a

14   neutral affect. (Tr. 715.)  She was alert, her memory was grossly intact, and she had good

15   insight and judgment.  (Tr. 716.)  Plaintiff continued to struggle with panic and

16   motivation.  She was diagnosed with bipolar disorder, panic disorder, and unspecified

17   personality disorder.  (Tr. 715-16.)

18   　　　　On July 29, 2009, Plaintiff reported to treatment providers at Southwest that the

19   increase in Abilify had helped "a little" with her depression, her anxiety "was better"

20   with Klonopin, and her sleep was improved with Ambien.  (Tr. 713.)  She still reported

21   some social anxiety.  (*Id.*)  She exhibited a neutral mood with appropriate affect.  (*Id.*)

22   She had normal speech and motor activity, goal directed thought, no delusions or

23   hallucinations, no thoughts of self-injury, she was alert, had good concentration, grossly

24   intact memory, and good insight and judgment.  (Tr. 713-14.)  Plaintiff's depression was

25   "somewhat better," but she continued to struggle with motivation and panic.  (*Id.*)

26   　　　　From September 15 through 17, 2009, Plaintiff was hospitalized at Banner

27   Thunderbird Medical Center for suicidal ideation with a recent attempt.  (Tr. 349.)  After

28   her release from the hospital, Plaintiff was transferred to Aurora Behavioral Health

- 4 -

1    (Aurora) for inpatient psychiatric care from September 17 through 21, 2009 for severe,
2    recurrent major depression.  (Tr. 359.)  On discharge, it was noted that Plaintiff had
3    responded well to treatment.  (*Id.*)  She denied depressive symptoms.  (*Id.*)  On
4    examination, Plaintiff was cooperative, alert, her thought was logical and coherent, her
5    speech and motor activity were normal, her affect was full, her cognitive functioning was
6    average, and her insight and judgment were fair.  (Tr. 359-60.)  She denied
7    hallucinations, delusions, and suicidal ideation.  (*Id.*)

8    After her discharge from Aurora, Plaintiff continued treatment at Magellan and
9    Southwest.  (Tr. 711.)  The Magellan records include an October 15, 2009 annual
10   assessment (for the period July 30, 2008 to October 15, 2009), which noted that Plaintiff
11   had received treatment for bipolar disorder and obsessive-compulsive disorder with
12   schizoaffective traits.  (Tr. 388.)  Her symptoms included irritability and self-abusing
13   behavior such as cutting herself, mood cycling, and isolation.  (*Id.*)  During a home visit
14   the week before the annual assessment, Plaintiff exhibited a dull, blunted affect, poor eye
15   contact, and her voice was low and rambling.  (*Id.*)  She reported that recent neck surgery
16   contributed to her depression.  (*Id.*)  Plaintiff reported that she had low energy and was
17   spending a lot of time in bed.  (*Id.*)  She displayed good information processing and
18   problem solving.  She was diagnosed with bipolar disorder.  (Tr. 380-90.)

19   On January 15, 2010, Plaintiff was treated at Southwest.  (Tr. 698.)  She described
20   her mood as "blah" and her energy as poor.  (*Id.*)  She reported some paranoia and social
21   phobia, and stated that she stayed home most of the time.  (Tr. 697.)  A mental status
22   examination indicated that Plaintiff was appropriately groomed with good hygiene.  She
23   had an appropriate affect, normal speech and motor activity, and goal directed thought.
24   (Tr. 699.)  She denied delusions, hallucinations, or self-injury.  (*Id.*)  She was alert and
25   had fair concentration, insight, and memory.  (*Id.*)  She was diagnosed with bipolar
26   disorder, social phobia, and post-traumatic stress disorder (PTSD).  (Tr. 698-99.)

27   On February 16, 2010 Plaintiff was treated at Magellan.  (Tr. 691.)  Plaintiff's
28   affect was appropriate and her mood was anxious.  (*Id.*)  She reported that she stayed

1  home most of the time.  (Tr. 692.)  Her symptoms were described as moderate and

2  minimally improved.  (*Id.*)  She was diagnosed with bipolar disorder, PTSD, social

3  phobia, and OCD.  (Tr. 697.)

4      On August 6, 2010, after Plaintiff's girlfriend committed suicide, Petitioner was

5  treated at Magellan for bipolar disorder.  (Tr. 682.)  Plaintiff was tearful, shocked and

6  upset, and reported that she might pursue inpatient psychological admission to Aurora.

7  (Tr. 681.)  Plaintiff's affect was appropriate and tearful, with an anxious and depressed

8  mood.  (Tr. 682.)  Her symptoms were noted to be moderate and globally minimally

9  worse.  (*Id.*)  She was diagnosed with bipolar disorder, PTSD, social phobia, and

10  obsessive-compulsive disorder.  (*Id.*)

11      From August 21 through 26, 2010, Plaintiff received inpatient care at Aurora for

12  suicidal ideation, bipolar disorder, OCD, and PTSD.  (Tr. 556-679)  Plaintiff "improved

13  rapidly and greatly during her stay."  (Tr. 556.)  She was "free of any depression and

14  suicidal ideation at the end of her stay."  (*Id.*)  On discharge, Plaintiff was diagnosed with

15  bipolar disorder, PTSD, obsessive-compulsive disorder, and cluster B traits.  (Tr. 556-

16  675.)

17      **B.**    **Treatment Related to Physical Health**

18      In addition to mental health issues, Plaintiff had chronic migraine headaches, neck

19  pain, optic neuritis, and syncope.  (Tr. 911-15.)  In 2006, her treating neurologist,

20  Dr. Shyamala Kumar, M.D., noted that Topamax resulted in a "35% improvement in

21  headaches."  (Tr. 766.)  In 2007, Dr. Kumar discontinued Topamax because he thought

22  that it could be contributing to suicidal thoughts.  (Tr. 763.)

23      In January 2008, Plaintiff had an episode of syncope while she was at work.

24  (Tr. 515.)  At Arrowhead Hospital, she was diagnosed with neurocardiogenic syncope

25  and directed to follow-up with her neurologist.  (*Id.*)  On February 1, 2008, Plaintiff

26  followed up with Dr. Kumar for tremors, syncope, migraine headaches, and neck pain.

27  (Tr. 539.)  Dr. Kumar noted that Plaintiff had had "few near syncope episodes" since she

28  had such an episode at work the previous week.  (*Id.*)

1    On February 18, 2008, Plaintiff saw Dr. Rick Okagawa, M.D. at Cardiovascular

2    Consultants for syncope.  (Tr. 547.)  Plaintiff reported continued episodes of syncope

3    without warning.  (*Id.*)  She reported that the "total duration of the episodes [was] usually

4    1 minute."  (*Id.*)  Dr. Okagawa advised Plaintiff to follow-up with his colleague

5    Dr. Deepak Khosla in two weeks.  (Tr. 548.)  On June 26, 2008, Plaintiff saw Dr. Khosla.

6    (Tr. 543.)  He noted that Plaintiff still had "symptoms of lightheadedness and a few

7    episodes of syncope."  (Tr. 543.)  He advised Plaintiff to ask her psychiatrist to prescribe

8    Paxil in place of Effexor because there was "not much experience with Effexor in

9    neurocardiac syncope."  (*Id.*)

10    On August 27, 2009, Plaintiff had an anterior cervical discectomy with fusion and

11    plating.  (Tr. 477-79, 480-82.)  In October 2009, Plaintiff reported ongoing headaches.

12    (Tr. 388-94.)  Plaintiff also reported that her neck pain and radicular symptoms subsided

13    post fusion.  (Tr. 470-71.)  Approximately ten months later, Plaintiff's migraine

14    headaches returned.  (Tr. 530-31, 997.)

15    In September 2010, Plaintiff was treated for a recurrence of neck pain.  On

16    examination, she was tender to palpation and had a markedly decreased range of motion.

17    (Tr. 823, 954, 991-92, 820-22.)  In May 2011, Plaintiff continued experiencing

18    headaches, but they were less intense and less frequent than in the past.  (Tr. 816-17.)

19    Medical records also show that Plaintiff had optic neuritis, and macular damage to the

20    right eye and blindness in the left.  (Tr. 459.)  Her right eye exhibited a retinal hole, with

21    severe loss of visual field.  (Tr. 979.)

22    **C.    Medical Opinion Evidence**

23    **1.    Akrum Al-Zubaidi, M.D.**

24    In February 2010, Plaintiff was examined by State Agency Physician Dr. Akrum

25    Al-Zubaidi.  (Tr. 441.)  Plaintiff's "chief complaint" was "vasovagal syncope."  (*Id.*)

26    Plaintiff reported that she had past cervical neck problems, but after cervical fusion her

27    neck pain was resolved.  (*Id.*)

28

1   She reported that she had "vasovagal syncope two years ago while working at

2   UPS," and that at the time of Dr. Al-Zubaidi's examination, she was passing out twice a

3   week. (*Id.*) She stated that "her mental condition is the main reason she that she [was]

4   unable to work, not her physical condition." (*Id.*) Plaintiff reported that she could cook,

5   clean, do yard work, and take care of her personal needs. (Tr. 442.) On examination,

6   Dr. Al-Zubaidi noted that Plaintiff was "very polite, well-dressed." (*Id.*) She had a

7   normal gait, was able to squat, heel talk, toe walk, tandem walk, and hop on either foot.

8   (*Id.*) She had a normal range of motion and full strength in her upper and lower

9   extremities. (*Id.*)

10   Dr. Al-Zubaidi completed a physical functional assessment. (Tr. 444-46.) He

11   opined that Plaintiff could sit and stand or walk six to eight hours in an eight-hour

12   workday. (Tr. 444.) He found that Plaintiff could lift fifty pounds occasionally and

13   twenty-five pounds frequently and that she was unrestricted in all other postural and

14   manipulative activities. (Tr. 444-45.) He further found that Plaintiff should avoid

15   working around heights and moving machinery. (Tr. 445.) He explained that Plaintiff

16   "suffer[ed] from vasovagal syncope with two full syncopal episodes per week. This

17   would make it dangerous for her to work around heights and around moving machinery."

18   (Tr. 446.)

19                    **2.    Jacqueline Farwell, M.D**

20   On March 2010, State Agency Physician Dr. Farwell reviewed the record and

21   completed a physical residual functional capacity (RFC) assessment. (Tr. 447-54.) She

22   assessed functional limitations similar to those found by Dr. Al-Zubaidi, but was

23   skeptical of Plaintiff's reports that she fainted twice a week. (Tr. 454.)

24                    **3.    Nicole Robicheau Psy.D.**

25   On February 5, 2010, Dr. Robicheau reviewed the medical records and completed

26   a mental RFC assessment. (Tr. 422.) She found Plaintiff not significantly limited in her

27   ability to remember work-like procedures, understand, remember, and carry out simple

28   instructions, perform activities within a schedule, maintain regular attendance, be

1  punctual, sustain an ordinary routine without special supervision, make simple work-

2  related decisions, to interact appropriately with the general public, to ask simple

3  questions, to maintain socially appropriate behavior, to respond appropriately to changes

4  in the work setting, to be aware of and respond to normal hazards, and to travel in

5  unfamiliar places or use public transit.  (Tr. 422-23.)

6        She also found that Plaintiff had moderate limitations in her abilities to

7  understand, remember, and carry out detailed instructions, maintain concentration and

8  attention for extended periods, work in proximity of others without being distracted by

9  (or distracting to) them, complete a normal workday and workweek without interruptions

10  from psychologically based symptoms, perform at a consistent pace, accept instruction

11  and criticism from supervisors, and to set realistic goals or make plans independently of

12  others.  (Tr. 422-23.)  At the end of the RFC assessment, in a section labeled "functional

13  capacity assessment," Dr. Robicheau opined that Plaintiff was "able to meet the demands

14  of, at least, simple work."  (Tr. 424.)

15  **III.    Administrative Hearing Testimony**

16        Plaintiff was in her late thirties at the time of the administrative hearing.  (Tr. 36.)

17  She had a Bachelor's Degree and past work as a teacher and a package handler.  (Tr. 38-

18  40.)  Plaintiff testified that she cried daily and experienced feelings of worthlessness,

19  helplessness, and hopelessness.  (Tr. 43, 45.)  She stated that she had lost all of her

20  friends because she isolated herself and was agoraphobic.  (Tr. 45, 47.)  She had anxiety

21  that worsened when she left the house and required her to take Klonopin, which left her

22  feeling drained and fatigued.  (Tr. 48-49.)  Plaintiff testified that before and after cervical

23  fusion, she suffered from headaches.  (Tr. 49-51.)  She had three to five headaches per

24  week, resulting in photophobia and a need to lie down in a dark room for approximately

25  one hour.  (Tr. 49-50.)  Plaintiff also testified that once a week she experienced syncope

26  that caused her to "completely black out and hit the floor."  (Tr. 52.)  She testified that

27  such episodes "usually last[ed] as little as one to three minutes."  (Tr. 53-54.)  She also

28  testified that three to five times a week she had syncope that did not make her pass out,

1   but that made her "dizzy, lightheaded, and confused," and lasted about "a half-hour."

2   (Tr. 53.)

3       The ALJ concluded that Plaintiff had the RFC to perform "a significant range of

4   medium work."  (Tr. 17.)  Specifically, the ALJ found that Plaintiff could "lift and/or

5   carry 50 pounds occasionally and 25 pounds frequently," "stand and/or walk for six hours

6   out of an eight-hour workday with regular breaks," and "sit for six hours out of an eight-

7   hour workday with regular breaks."  (Tr. 17.)  The ALJ further found that Plaintiff was

8   "precluded from climbing ladders, ropes or scaffolds," that she could occasionally stoop,

9   and could frequently perform "all other postural activities."  (*Id.*)  Finally, he found that

10  "she should avoid work requiring use of dangerous machinery or work at unprotected

11  heights, [and that she was] limited to occasional interaction with the public and co-

12  workers."  (*Id.*)

13      The vocational expert testified that an individual with the limitations that the ALJ

14  included in his assessment of Plaintiff's RFC could perform work as a hand packager

15  "either as claimant performed it or as it was customarily performed."  (Tr. 63.)  In

16  response to questions from Plaintiff's attorney, the vocational expert testified that

17  Plaintiff's reported symptoms and limitations would preclude her from performing her

18  past work and from sustaining other full time competitive employment.  (Tr. 67-70.)

19  **IV.    The ALJ's Decision**

20      Under the Social Security Act, a plaintiff is considered disabled if she is unable to

21  "engage in any substantial gainful activity by reason of any medically determinable

22  physical or mental impairment which can be expected to result in death or which has

23  lasted or can be expected to last for a continuous period of not less than 12 months."  42

24  U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A) (nearly identical standard for

25  supplemental security income disability insurance benefits).  The ALJ uses a five-step

26  sequential evaluation process to determine whether an individual is disabled.  *See* 20

27  C.F.R. §§ 404.1520, 416.920.

28

### A.    Five-Step Evaluation Process

In the first two steps, a claimant seeking disability benefits must initially demonstrate (1) that she is not presently engaged in a substantial gainful activity, and (2) that her impairments are severe.  20 C.F.R. § 404.1520(a) (c).  If a claimant meets steps one and two, she may be found disabled in two ways at steps three and four.  At step three, she may prove that her impairment or combination of impairments meets or equals an impairment in the Listing of Impairments found in Appendix 1 to Subpart P of 20 C.F.R. pt. 404. 20 C.F.R. § 404.1520(a)(4)(iii).  If so, the claimant is presumptively disabled.  If not, the ALJ determines the claimant's RFC.  At step four, the ALJ determines whether a claimant's RFC precludes her from performing her past work.  20 C.F.R. §  404.1520(a)(4)(iv).  If the claimant establishes this prima facie case, the burden shifts to the government at step five to establish that the claimant can perform other jobs that exist in significant number in the national economy, considering the claimant's RFC, age, work experience, and education.  If the government does not meet this burden, then the claimant is considered disabled within the meaning of the Act.

### B.    The ALJ's Application of the Five-Step Evaluation Process

Applying the five-step sequential evaluation process, the ALJ first found that Plaintiff had not engaged in substantial gainful activity during the relevant period.  (Tr. 15.)  At step two, the ALJ found that Plaintiff had the following severe impairments: "post-traumatic stress disorder, migraines, post neck fusion in August 2009; syncope (loss of strength or fainting); obsessive compulsive disorder; panic attacks; fatigue; insomnia; agoraphobia; depression; loss of vision in the right eye; and bipolar disorder." (Tr. 16.)   At step three, the ALJ found that Plaintiff did not have an impairment, or combination of impairments, that met or equaled the severity of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1.  (*Id.*)   At step four, the ALJ found that, considering Plaintiff's RFC, age, education, work experience, she could perform her past relevant work as a hand packager. (Tr. 22.)  Accordingly, without reaching step five, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act.  (*Id.*)

1    **V.     Standard of Review**

2           The district court has the "power to enter, upon the pleadings and transcript of

3    record, a judgment affirming, modifying, or reversing the decision of the Commissioner,

4    with or without remanding the case for a rehearing."  42 U.S.C. § 405(g).  The district

5    court reviews the Commissioner's final decision under the substantial evidence standard

6    and must affirm the Commissioner's decision if it is supported by substantial evidence

7    and it is free from legal error.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996);

8    *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  Even if the

9    ALJ erred, however, "[a] decision of the ALJ will not be reversed for errors that are

10   harmless."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

11          Substantial evidence means more than a mere scintilla, but less than a

12   preponderance; it is "such relevant evidence as a reasonable mind might accept as

13   adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)

14   (citations omitted); *see also Webb v Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005).  In

15   determining whether substantial evidence supports a decision, the court considers the

16   record as a whole and "may not affirm simply by isolating a specific quantum of

17   supporting evidence."  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (internal

18   quotation and citation omitted).

19          The ALJ is responsible for resolving conflicts in testimony, determining

20   credibility, and resolving ambiguities.  *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th

21   Cir. 1995).  "When the evidence before the ALJ is subject to more than one rational

22   interpretation, [the court] must defer to the ALJ's conclusion."  *Batson v. Comm'r of Soc.

23   Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004) (citing *Andrews*, 53 F.3d at 1041).

24   **VI.    Plaintiff's Claims**

25          Plaintiff asserts that the ALJ erred by discounting her symptom testimony

26   (Doc. 23 at 13-22), failing to properly weigh medical source opinions (*Id.* at 22-25), and

27   erroneously finding that she had past relevant work as a hand packager.  (*Id.* at 25-26.)

28   Plaintiff argues that this matter should be remanded for computation of benefits.  (*Id.* at

26.)   The Commissioner opposes Plaintiff's assertions and argues that the Commissioner's decision should be affirmed because it is free from legal error and supported by substantial evidence in the record.  (Doc. 28.)

### A.   Plaintiff's Symptom Testimony

#### 1.   The Two-Step Credibility Analysis

Plaintiff asserts that the ALJ erred in finding her symptom testimony less than credible.  (Doc. 23 at 14.)  An ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible.  *Garrison*, 2014 WL 3397218, at *16 n.18 (citing *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)).

"First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'"  *Lingenfelter*, 504 F.3d at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).  The claimant is not required to show objective medical evidence of the pain itself or of a causal relationship between the impairment and the symptom.  *Smolen*, 80 F.3d at 1282.  Instead, the claimant must only show that an objectively verifiable impairment "could reasonably be expected" to produce his pain."  *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1282); *see also Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d at 1160–61 (9th Cir. 2008) ("requiring that the medical impairment 'could reasonably be expected to produce' pain or another symptom . . . requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon").

Second, if a claimant shows that he suffers from an underlying medical impairment that could reasonably be expected to produce his pain or other symptoms, the ALJ must "evaluate the intensity and persistence of [the] symptoms" to determine how the symptoms, including pain, limit the claimant's ability to work.   *See* 20 C.F.R. § 404.1529(c)(1).  In making this evaluation, the ALJ may consider the objective medical evidence, the claimant's daily activities, the location, duration, frequency, and

1    intensity of the claimant's pain or other symptoms, precipitating and aggravating factors,

2    medication taken, and treatments for relief of pain or other symptoms.  *See* 20

3    C.F.R. § 404.1529(c); *Bunnell*, 947 F.2d at 346.

4          At this second evaluative step, the ALJ may reject a claimant's testimony

5    regarding the severity of her symptoms only if the ALJ "makes a finding of malingering

6    based on affirmative evidence," *Lingenfelter*, 504 F.3d at 1036 (quoting *Robbins v. Soc.*

7    *Sec. Admin*., 466 F.3d 880, 883 (9th Cir. 2006)), or if the ALJ offers "clear and

8    convincing reasons" for finding the claimant not credible.  *Carmickle*, 533 F.3d at 1160

9    (quoting *Lingenfelter*, 504 F.3d at 1036).  "'The clear and convincing standard is the

10   most demanding required in Social Security Cases.'"  *Garrison*, 2014 WL 3397218, at

11   *15-18 (quoting *Moore v. Soc. Sec. Admin*., 278 F.3d 920, 924 (9th Cir. 2002)).

12                    **2.    The ALJ's Assessment of Plaintiff's Credibility**

13         The ALJ found that Plaintiff had the RFC to perform a significant range of

14   medium work with some postural and environmental limitations.  (Tr. 17.)   In making

15   this determination, the ALJ found that Plaintiff's allegations of disabling symptoms

16   (including "anxiety, syncope, depression, and neck pain") were "less than fully credible"

17   with regard to the "intensity, persistence, and limiting effects" of those symptoms.

18   (Tr. 18.)   Because there was no finding of malingering, the ALJ was required to give

19   clear and convincing reasons for finding Plaintiff not credible.  *Carmickle*, 533 F.3d at

20   1160.   Plaintiff asserts that the ALJ failed to give clear and convincing reasons for

21   rejecting her symptom testimony.  (Doc. 23 at 14.)

22                    **a.    Lack of Objective Verification of Daily Activities**

23         Plaintiff testified that she spent most of the day at home in her pajamas, she did

24   simple household chores, and that her adult daughter did most of the shopping and

25   cleaning.   (Tr. 44-46.)   In finding Plaintiff's symptom testimony "less than fully

26   credible," the ALJ stated that "although the claimant has described daily activities that

27   are fairly limited, . . . the allegedly limited daily activities cannot be objectively verified

28   with any reasonable degree of certainty."  (Tr. 18.)

1    "This . . . justification for the ALJ's credibility finding has been used in almost

2    identical form by other ALJs and rejected." *Garcia v. Astrue*, 2013 WL 1797029, at \*15

3    (S.D. Cal. Mar. 13, 2013) (citing *McKim v. Astrue*, 2012 WL 5250096, \*4–\*5

4    (W.D. Wash. Sept. 4, 2012))[3].  As the *Garcia* and *McKim* courts found, the fact that "'a

5    fact cannot be verified objectively provides little evidence to support the conclusion that

6    the individual is not being truthful about such fact in any particular instance.'" *Garcia*,

7    2013 WL 1797029, at \*15 (quoting *McKim*, 2012 WL 525096, at 4).   Therefore, the

8    Court concludes that this is not a legally sufficient basis for the ALJ's credibility

9    determination.

10             **b.       Other Explanations for Plaintiff's Limited Daily Activities**

11        The ALJ next stated that:

12            [E]ven if the claimant's daily activities are truly as limited as
             alleged, it is difficult to attribute that degree of limitation to
13            the claimant's medical condition, as opposed to other reasons,
             in view of the relatively weak medical evidence and other
14            factors discussed in this decision.  It appears that the limited
             range of daily activities *is a lifestyle choice* and not due to
15            any established impairment.

16    (Tr. 18.) (emphasis added.)

17        The record reflects that, in July 2010, Plaintiff reported that her "social/leisure

18    time was important to her."  (Tr. 835.)  She "enjoyed shopping, movies, and outings with

19    her children."  (*Id.*)  Plaintiff's mental health care providers encouraged her "continue to

20    engage in activities that she love[d] and to increase her activity level."  (*Id.*)  Plaintiff

21    agreed to short-term goals that included walking her dogs daily and hiking weekly with

22    her family.  (Tr. 836.)  The treatment provider noted that Plaintiff could drive, attend

23

24        [3]   In *McKim*, the ALJ rejected Plaintiff's symptom testimony and stated that
25    "[w]hile the claimant has alleged daily activities that are fairly limited, . . . allegedly
     limited daily activities cannot be objectively verified with any reasonable degree of
26    certainty.  2012 WL 5250096, at \*4-\*5.  In *Garcia*, the ALJ provided the same reasons
     for rejecting the claimant's symptom testimony.  2013 WL 1797029, at \*15.

27

28

1   appointments, and "complete her activities of daily living." (Tr. 834.) This record

2   evidence supports that ALJ's finding that Plaintiff's restriction of her daily activities may

3   have been a lifestyle choice.

4                    **c.   Inconsistency with Medical Evidence**

5        The ALJ also discounted Plaintiff's symptom testimony because it was

6   inconsistent with the medical record.[4] (Tr. 18-20.) Plaintiff contends that medical record

7   supports her subjective complaints. (Doc. 31 at 5.) "[A]fter a claimant produces

8   objective medical evidence of an underlying impairment, an ALJ may not reject a

9   claimant's subjective complaints based solely on a lack of medical evidence to fully

10  corroborate the alleged severity of pain." *Burch*, 400 F.3d at 680. "Although lack of

11  medical evidence cannot form the sole basis for discounting pain testimony, it is a factor

12  that the ALJ can consider in his credibility analysis." *Id.* at 681.

13       Here, the ALJ did not discredit Plaintiff's subjective complaints solely on the basis

14  of a lack of supporting objective medical evidence. Rather, he provided additional clear

15  and convincing reasons for concluding that Plaintiff's subjective complaints were not

16  wholly credible. Additionally, the ALJ cited more than a scintilla of evidence to support

17  his finding that Plaintiff's testimony regarding her symptoms was inconsistent with the

18  objective medical evidence as a whole. (Tr. 19-21); *see Ryan*, 528 F.3d at 1198

19  (substantial evidence is more than a scintilla and less than a preponderance).

20       As the ALJ noted, the record reflects, that although Plaintiff had low Global

21  Assessment of Functioning (GAF) scores during "periods of crisis" (Tr. 21), her GAF

22  scores during much of the relevant period were consistent with mild or transient mental

23  health symptoms. (Tr. 557-58 (GAF 80), Tr. 707 (GAF 70), 733 (GAF 70), and 737

24  (GAF 70).); *see Nelson v. Colvin*, 2013 WL 4010860, at *7 (D. Ariz. Aug. 6, 2013);

25  _____

26      [4]  In her reply, Plaintiff states that "it is not clear whether the ALJ based his
    credibility finding" on a determination that her symptom testimony was not consistent
27  with the medical record. (Doc. 31 at 5.) In his decision, the ALJ stated that he
    discounted Plaintiff's credibility because her subjective complains were "inconsistent
28  with the objective medical evidence." (Tr. 18.) He also noted that the medical evidence
    was "relatively benign." (*Id.*) Thus, the ALJ relied on the medical record as a basis for
    discounting Plaintiff's credibility.

1  *Bizonia v. Astrue,* 2011WL 1656075, at *2 n.3 (C.D. Cal. May 3, 2011).   The ALJ

2  properly considered Plaintiff's GAF scores in determining whether she was disabled.[5]

3  *See Burkin v. Astrue*, 2012 WL 21916984, at *6 (D. Ariz. Jun. 14, 2012) (stating that "the

4  fact that [the claimant] routinely had GAF scores that reflected no more than moderate

5  symptoms or limitations was a legitimate reason for the ALJ to consider when

6  determining whether [the claimant] was unable to work.").

7      The ALJ also noted that Plaintiff's mental status examinations were mainly

8  unremarkable.   (Tr. 20.)   Substantial evidence in the record supports this finding.   For

9  example, a January 29, 2009 progress note reflects that Plaintiff reported obsessively

10  washing her hands.   (Tr. 724.)   On examination she had a euthymic mood, normal speech,

11  a cooperative attitude, a goal-directed thought process.   (*Id.*)   She did not have any

12  delusions, hallucinations, or "self-injury" behavior.   (Tr. 724-25).   Additionally, she was

13  alert, had good concentration, her memory was "grossly intact," and she had good insight

14  and judgment.   (Tr. 745.)   Other treatment notes in the record include similar mental

15  status examinations.   (Tr. 299 (cooperative, appropriate affect, goal oriented thought,

16  good insight and judgment, denies thoughts of self-harm); Tr. 736-37 (no mood swings,

17  appropriate affect, no delusions or hallucinations, no self-injury, alert, intact memory,

18  good insight and judgment); Tr. 741-42 (cooperative, happy mood, appropriate affect,

19  goal directed thought, no delusions or self-injury, alert, good concentration, grossly intact

20  memory, good insight and judgment).)

21  _____

22      [5]  A GAF score is a rough estimate of an individual's psychological, social, and
occupational functioning used to reflect the individual's need for treatment."   *Brewes v.*

23  *Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1160 n.2 (9th Cir. 2012) (quoting *Vargas v.*
*Lambert,* 159 F.3d 1161, 1164 n.2 (9th Cir. 1998)).   GAF Scores range from 1-100.

24  DSM–IV at 32.

25      A GAF "score of 61-70 reflects mild symptoms or some difficulty in social,
occupational, or school functioning, but generally functioning pretty well."   *Nelson,* 2013

26  WL 4010860, at *7 (citing DSM-IV).

27      A GAF between 71 and 80 indicates that if symptoms are present, they are
transient and expectable reactions to psychological stressors (e.g., difficulty concentrating

28  after family argument); "no more than slight impairment in social, occupational, or
school functioning."   *Bizonia,* 2011WL 1656075, at *2 n.3 (citing DSM-IV).

1    Although Plaintiff was hospitalized two separate times with suicidal ideation and
2    depression, once in September 2009 and again in August 2010, Plaintiff quickly
3    improved during her hospital stays.  (Tr. 359 (Plaintiff "responded well to her treatment
4    [and] denied any depressive symptoms prior to her discharge"); Tr. 359-60 (Plaintiff
5    "denied suicidal ideation"); Tr. 556 (Plaintiff "improved rapidly and greatly during her
6    [stay] and became free of any depression and suicidal ideation at the end of her stay")).)

7         The ALJ properly considered this evidence when weighing Plaintiff's credibility.
8    *See Crane v. Shalala*, 76 F.3d 251, 254 (9th Cir. 1996) ("While subjective pain testimony
9    cannot be rejected on the sole ground that it is not fully corroborated by objective
10   medical evidence, the medical evidence is still a relevant factor in determining the
11   severity of the claimant's pain and its disabling effects." (citation omitted)).

12                    **d.      Medical Treatment Inconsistent with Claimed Disability**

13        The ALJ also found Plaintiff not entirely credible because she did not receive "the
14   type of medical treatment one would expect for a disabled individual" and had "relatively
15   infrequent trips to the doctor."  (Tr. 18.)  "[E]vidence of "conservative treatment" can be
16   sufficient to discount a claimant's testimony regarding severity of an impairment."  *Parra*
17   *v. Astrue*, 481 F.3d 742 (9th Cir. 2007) (citing *Johnson v. Shalala*, 60 F.3d 1428, 1434
18   (9th Cir. 1995)).  However, the record indicates that Plaintiff received both outpatient and
19   inpatient care for her mental health complaints and that she was hospitalized two times in
20   relation to those issues.  *Cf. Scott v. Astrue*, 2012 WL 2000842, at *17 (S.D. Cal. Apr. 13,
21   2012) (the ALJ did not err by discounting the claimant's credibility on the ground that he
22   had not received the type of treatment one would expect for a disabled individual when
23   the record reflected that the claimant received intermittent outpatient care for his mental
24   complaints, was only hospitalized for alcohol-related episodes, and his symptoms were
25   controlled by medication when he was compliant).  Accordingly, the ALJ's finding that
26   Plaintiff did not receive the type or frequency of treatment that one would expect of a
27   disabled individual is not supported by substantial evidence in the record.

28

1          **e.      Lack of Compliance with Treatment**

2          To further support his credibility determination, the ALJ stated that Plaintiff had a

3   history of poor compliance with treatment, including "failure to appear for scheduled

4   appointments or to take medication as directed."  (Tr. 18.)  The ALJ noted that Plaintiff

5   explained that she had poor compliance with appointments because she did not want to

6   leave the house due to her anxiety or she could not get a ride.  (Tr. 18, Tr. 58.)

7          Non-compliance with treatment may support an adverse credibility finding.  *See*

8   *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) (stating that "an unexplained, or

9   inadequately explained, failure to . . . follow a prescribed course of treatment . . . can cast

10  doubt on the sincerity of the claimant's pain testimony); *Burch*, 400 F.3d at 681 (lack of

11  consistent treatment may be considered in assessing credibility as to severity of pain);

12  *Bunnell*, 947 F.2d at 346 (non-compliance with prescribed course of treatment is a

13  relevant factor in assessing credibility).

14         The record reflects that Plaintiff missed multiple appointments at Magellan in

15  2008 and 2009.  (Tr. 722 ("no show"); Tr. 729 ("NS" "last seen 5/08"); Tr. 731-32

16  ("consumer was a NS" "last seen 5/7/2008" at that time she "reported zero mood swings"

17  and some depression, "no use of crisis system" "labs have been ordered but she has not

18  showed for appointment"); Tr.738 ("No Show"); Tr. 739 ("No Show" "last seen on 1/08

19  at that time she was doing well"); Tr. 303 (not compliant with scheduled medication

20  meetings or with medication); Tr. 710 ("No show").)  A January 12, 2009 treatment notes

21  states that Plaintiff "ha[d] not been compliant with her scheduled medical meetings."

22  (Tr. 395.)  It also states that Plaintiff "was educated on the issues regarding non-

23  compliance with medication" and was instructed "not to wait until [she was] out of

24  medication before ordering them."  (*Id.*)

25         Similarly, a July 28, 2010 Behavioral Update and Review Summary from

26  Magellan reports that for the period between October 5, 2009 and July 28, 2010, Plaintiff

27  was "sporadic in attending her psychiatric appointments for medication monitoring to

28  address signs and symptoms of psychiatric illness."  (Tr. 843.)

1     Although Plaintiff testified at the administrative hearing that she missed

2 appointments because she did not want to (or was afraid to) leave the house or could not

3 get rides, a July 30, 2010 treatment record reflects that Plaintiff reported "that her

4 social/leisure time [was] important to her" and that she enjoyed "shopping, movies, and

5 outings with her children" (Tr. 835), but she had declined "groups and counseling." (*Id.*)

6 Thus, Plaintiff's explanation for missing her appointments is inconsistent with other

7 evidence in the record.

8     Plaintiff also asserts that her noncompliance was related to the symptoms of her

9 mental impairments (Doc. 23 at 17 (referring to Plaintiff's anxiety and depression)), and

10 therefore is not an appropriate basis for discrediting her subjective symptom testimony.

11 The symptoms of a claimant's mental impairments may explain a claimant's

12 noncompliance with treatment. *See Nguyen v. Chater*, 100 F.3d 1462 (9th Cir. 1996)

13 ("[I]t is a questionable practice to chastise one with a mental impairment for the exercise

14 of poor judgment in seeking rehabilitation.") (internal quotation marks and citation

15 omitted). The medical providers in this case, however, did not make a connection

16 between Plaintiff's noncompliance and her mental health impairment. *See Molina v.*

17 *Astrue*, 674 F.3d 1104, 1114 (9th Cir. 2012) ("Although Molina provided reasons for

18 resisting treatment, there was no medical evidence that Molina's resistance was

19 attributable to her mental impairment rather than her own personal preference, and it was

20 reasonable for the ALJ to conclude that the 'level or frequency of treatment [was]

21 inconsistent with the level of complaints.'") (citing SSR 96-7p). Additionally, Plaintiff

22 sought help for her mental health issues, but failed to follow through with that care. *See*

23 *Minter v. Comm'r Soc. Sec.*, 2012 WL 1866608, at *5 (D. Or. May 22, 2012) (when the

24 claimant recognized that she needed help and sought out counseling, her failure to follow

25 through with that treatment was a clear and convincing reason for the ALJ to discredit her

26 symptom testimony).

27     Although the record includes some treatment notes indicating that Plaintiff

28 complied with treatment, "[w]hen the evidence before the ALJ is subject to more than

one rational interpretation, [the reviewing court] we must defer to the ALJ's conclusion." *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004).   Thus, Plaintiff's noncompliance with treatment was an appropriate basis for the ALJ to discount her credibility.

### f.       Exaggeration of Symptoms

The ALJ also found Plaintiff less than entirely credible because there was "reference to treating physicians' questioning whether [Plaintiff's] symptoms [were] as severe as she alleges."  (Tr. 19, 21 (citing Admin. Hrg. Ex. B16F at 1).)  To support this statement, the ALJ cites Dr. Kumar's May 3, 2010 treatment note related to a follow-up appointment with Plaintiff.   (Tr. 21 (citing Admin. Hrg. Ex. B16F at 1; Tr. 530).) Dr. Kumar noted that he had not seen Plaintiff since May 2009 when he had sent her to a cardiologist, Dr. Khosla, because she had several episodes of syncope. (Tr. 530.)  During the follow-up appointment, Plaintiff reported that she "was passing out daily."  (*Id.*) Dr. Kumar concluded that it was "not convincing that [Plaintiff was] passing out daily." (*Id.*)  He noted that Plaintiff had not followed up with her cardiologist during the last eighteen months and that she was driving, even though she reported passing out daily. (*Id.*)  Dr. Kumar again advised Plaintiff to follow up with her cardiologist for further testing.  (Tr. 530.)

Evidence of symptom exaggeration is a valid basis for discounting a claimant's credibility.  *See Benton v. Barnhart*, 331 F.3d 1030, 1040 (9th Cir. 2003); *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001).  Here, Dr. Kumar's May 3, 2010 treatment note is substantial evidence to support the ALJ's conclusion that Plaintiff exaggerated the frequency of her syncope.  Additionally, reviewing physician Dr. Farwell was skeptical of Plaintiff's reports that she fainted as often as she reported.  (Tr. 454.)  Accordingly, symptom exaggeration was a legally sufficient basis for ALJ to discredit Plaintiff's testimony regarding her symptoms related to her syncope.

/ / /

/ / /

1          **g.     Inconsistencies between Testimony and the Record**

2          The ALJ also discounted Plaintiff's symptom testimony because she gave

3   conflicting information about why her last job ended.  (Tr. 19.)  The ALJ stated that

4   Plaintiff testified that she stopped working at UPS because of her impairments, and that

5   this testimony conflicted with a disability report stating that Plaintiff was laid off from

6   that position.  (Tr. 19 (citing Admin. Hrg. Ex. B1E at 2).)

7          These two statements, however, are not in conflict.  Plaintiff testified that her work

8   at UPS ended because she missed a lot of days, left work, or had to be hospitalized due to

9   anxiety and syncope.  (Tr. 39.)  The ALJ asked Plaintiff if she "quit or did [UPS]

10  terminate [you ?]"  (Tr. 40.)  In response to the ALJ's question, Plaintiff testified that,

11  after her cardiologist diagnosed her with syncope, she gave "notice that [she] wasn't

12  coming back."  (Tr. 40.)  Although it is not clear whether Plaintiff quit or was terminated,

13  the record indicates that her job ended due to her impairments.

14         Plaintiff's testimony is consistent with the disability report cited by the ALJ.

15  (Tr. 19 (citing Admin. Hrg. Ex. B1E); Tr. 155-56).)  On that report, Plaintiff stated that

16  "going to work caused her blood pressure to drop so low that [she] would black out and

17  had to go on medical leave and was diagnosed with vassal vascular syncope.  Due to the

18  medical leave [UPS] laid [her] off."  (Tr. 156.)  Because substantial evidence in the

19  record does not support the ALJ's conclusion that Plaintiff gave conflicting testimony

20  about why her job ended, the alleged conflicting statements were not legally sufficient

21  reasons for the ALJ to discount Plaintiff's symptom testimony.

22         Although the Court does not accept all of the ALJ's reasons in support of his

23  adverse credibility determination, the ALJ provided sufficient legally sufficient reasons

24  that are supported by substantial evidence in support of his credibility determination and,

25  therefore, the Court affirms that determination.  *See Batson*, 359 F.3d at 1197 (stating that

26  the court may affirm an ALJ's overall credibility conclusion even when not all of the

27  ALJ's reasons are upheld); *Tonapetyan*, 242 F.3d at 1148 (stating that "[e]ven if we

28  discount some of the ALJ's observations of [the claimant's] inconsistent statements and

1   behavior . . . we are still left with substantial evidence to support the ALJ's credibility

2   determination.").

3   **B.   Weighing Medical Source Opinion Evidence**

4   Plaintiff also argues that the ALJ improperly weighed medical source opinion

5   evidence.   (Doc. 23 at 22.)   In weighing medical source evidence, the Ninth Circuit

6   distinguishes between three types of physicians: (1) treating physicians, who treat the

7   claimant; (2) examining physicians, who examine but do not treat the claimant; and

8   (3) non-examining physicians, who neither treat nor examine the claimant.  *See Garrison,*

9   2014 WL 3397218, at *13 (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)).

10  Generally, more weight is given to a treating physician's opinion.  *Garrison,* 2014 WL

11  3397218, at *13.   The ALJ must provide clear and convincing reasons supported by

12  substantial evidence for rejecting a treating or an examining physician's uncontradicted

13  opinion.  *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).   An ALJ may reject the

14  controverted opinion of a treating or an examining physician by providing specific and

15  legitimate reasons that are supported by substantial evidence in the record.  *Bayliss v.*

16  *Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005); *Reddick*, 157 F.3d at 725.

17  Opinions from non-examining medical sources are entitled to less weight than

18  treating or examining physicians.  *Lester*, 81 F.3d at 831.   Although an ALJ generally

19  gives more weight to an examining physician's opinion than to a non-examining

20  physician's opinion, a non-examining physician's opinion may nonetheless constitute

21  substantial evidence if it is consistent with other independent evidence in the record.

22  *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).   When evaluating medical

23  opinion evidence, the ALJ may consider "the amount of relevant evidence that supports

24  the opinion and the quality of the explanation provided; the consistency of the medical

25  opinion with the record as a whole; [and] the specialty of the physician providing the

26  opinion . . . ."  *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007).

27  / / /

28  / / /

### 1.      The ALJ Properly Considered Dr. Al-Zubaidi's Opinion

Upon examination of Plaintiff, Dr. Al-Zubaidi noted that Plaintiff suffered from vasovagal syncope with two full syncopal episodes per week.  (Tr. 446.)  He concluded that these episodes would "make it dangerous for [Plaintiff] to work around heights and around moving machinery."  (*Id.*)  Dr. Al-Zubaidi opined that, with those restrictions, Plaintiff could perform a range of medium work, lifting up to fifty pounds for up to one-third of the workday.  (Tr. 446.)  The ALJ gave Dr. Al-Zubaidi's opinion "great weight" (Tr. 21), and included limitations on working around heights and moving machinery in the RFC.  (Tr. 17 (Plaintiff "should avoid work requiring the use of dangerous machinery or work at unprotected heights").)

Plaintiff argues that the ALJ formulated an RFC that did not fully account for Dr. Al-Zubaidi's opinions regarding her syncope.  (Doc. 23 at 23.)  Plaintiff suggests that the ALJ erred because the RFC did not fully account for the effects of a full syncope episode — "being off task for thirty minutes."  (*Id.*)  This argument is based on Plaintiff's subjective complaints that the ALJ properly discounted (*see* Section V.A.2.F) and does not correspond to Dr. Al-Zubaidi's opinion.  (Tr. 446.)  The record reflects that the ALJ assessed an RFC that fully accounted for Dr. Al-Zubaidi's opinion regarding Plaintiff's functional limitations.   Therefore, the Court rejects Plaintiff's argument that the ALJ erred in formulating Plaintiff's RFC.

### 2.      The ALJ's Assessment of Dr. Robicheau's Opinion

Plaintiff next argues that the ALJ erred by assigning "some" weight to non-examining physician Dr. Robicheau's opinion, but not explaining why he excluded from the RFC Dr. Robicheau's findings that Plaintiff was moderately limited in her activities of daily living, and in maintaining concentration, persistence, or pace.  (Doc. 23 at 24 (citing Tr. 436).)  The Commissioner responds that Plaintiff "relies on the wrong form" to support her argument.  (Doc. 28 at 10.)

Plaintiff relies on part of a Psychiatric Review Technique Form (Tr. 436) that Dr. Robicheau completed to determine whether Plaintiff's impairments met or equaled a

1    listed impairment at step three of the sequential evaluation process.  (Tr. 426-439).)  On

2    that form, Dr. Robicheau opined that Plaintiff had moderate limitations in her activities of

3    daily living and in "maintaining concentration, persistence, or pace."   (Tr. 436.)

4    Dr. Robicheau then concluded that Plaintiff's mental health impairment did not meet or

5    equal a listed impairment.  (Tr.438.)  The Commissioner argues that these findings were

6    only relevant to whether Plaintiff's impairments met a listed impairment, and did not bear

7    on her functional abilities for purposes of assessing her RFC.  (Doc. 28 at 10.)  The Court

8    does not resolve this issue because, as Plaintiff notes in her reply (Doc. 31 at 9-11),

9    Dr. Robicheau also found Plaintiff moderately limited in several areas of functioning on

10   the Mental Residual Functional Capacity (MRFC) Assessment.  (Tr. 422.)

11        Specifically, Dr. Robicheau found Plaintiff moderately limited in her abilities to

12   understand, remember, and carry out detailed instructions, maintain concentration and

13   attention for extended periods, work in proximity of others without being distracted by

14   (or distracting to) them, complete a normal workday and workweek without interruptions

15   from psychologically based symptoms, to perform at a consistent pace, accept instruction

16   and criticism from supervisors, and to set realistic goals or make plans independently of

17   others.   (Tr. 422-23.)   Dr. Robicheau also found Plaintiff not significantly limited in

18   other areas of mental functioning.  (*Id.*)  Based on all of her findings, she concluded that

19   Plaintiff could "meet the demands of, at least, simple work."  (Tr. 424.)

20        The ALJ stated that he gave "some weight" to Dr. Robicheau's opinion on the

21   MRFC assessment.  (Tr. 22.)  The ALJ rejected Dr. Robicheau's final conclusion that

22   Plaintiff was "limited to simple, repetitive tasks" because he found that the medical

23   record did not support that determination.  (Tr. 22 (citing Admin. Hrg. Exs. B8F, 10F).)

24   Because Dr. Robicheau's opinion that Plaintiff retained the functional capacity to

25   perform "simple work" incorporated all of the limitations that she found, including

26   moderate limitations on Plaintiff's functional abilities (Tr. 424), the ALJ's discussion of

27   that final opinion necessarily included all of those limitations.  Thus, the Court rejects

28

1   Plaintiff's assertion that the ALJ "offer[ed] no basis for excluding from the RFC

2   assessment" the moderate limitations that Dr. Robicheau identified.  (Tr. 23 at 24.)

3         Although the ALJ generally rejected Dr. Robicheau's final opinion, he accepted

4   her specific findings regarding Plaintiff's limitations in her ability to interact with the

5   public and co-workers, explaining that "the evidence better support[ed] limitations in

6   interaction with others." (Tr. 22.)  Accordingly, the ALJ formulated an RFC that "limited

7   [Plaintiff] to occasional interaction with the public and co-workers." (Tr. 17.)

8         Before rejecting Dr. Robicheau's final opinion that Plaintiff was limited to simple

9   work as not supported by the record, the ALJ discussed the medical record and noted that

10  the "medical evidence was relatively benign." (Tr. 18.)  As discussed above, the medical

11  record includes many unremarkable mental status examinations and GAF scores

12  indicating mild or transient symptoms.  (Section V.A.2.c.)  The ALJ properly considered

13  the medical record when assigning weight to Dr. Robicheau's opinion.  See *Sousa v.*

14  *Callahan*, 143 F.3d 1240, 1244 (9th Cir. 1998) (stating that an ALJ "may reject the

15  opinion of a non-examining physician by reference to specific evidence in the medical

16  record.").

17        Moreover, even if the ALJ erred in rejecting Dr. Robicheau's opinion that Plaintiff

18  was limited to simple work, that error was harmless because he found Plaintiff capable of

19  performing her past relevant work as a hand packager, which is classified as "unskilled."

20  (Tr. 22); Dictionary of Occupational Titles 920.587-018; *Johnson v. Astrue*, 2008 WL

21  346106, *4 (D. Or. Feb. 4, 2008) (stating that the "hand packager job, entitled "Packager,

22  Hand" (DOT Code: 920.587-018) is classified as unskilled with a medium exertional

23  level).

24        **C.    The ALJ's Step Four Analysis**

25        As previously stated, at step four of the sequential evaluation process, the ALJ

26  relied on the vocational expert's testimony that Plaintiff's past relevant work as a hand

27  packager, defined in Dictionary of Occupational Titles (DOT) as job number 920.587-

28

018, was unskilled work with a medium exertion level.[6]  (Tr. 63); *see Doyal v. Barnhart*, 331 F.3d 758, 760–61 (10th Cir. 2003) (at step four of the sequential evaluation process, an ALJ can comply with the requirements set forth in SSR 82–62 if he quotes the vocational expert's testimony with approval to support his findings at the step-four analysis); *Mora v. Astrue*, 2008 WL 5076450, *2 (C.D. Cal. Dec.1, 2008) ("Information from the [DOT] or the testimony of a [vocational expert] may be used to ascertain the demands of an occupation as ordinarily required by employers throughout the national economy.") (citing SSR 82-61).   The vocational expert testified that Plaintiff could perform her past relevant work as a hand packager "either as the claimant performed it or as customarily performed."[7]  (Tr. 63.)

Past relevant work is work "that a [claimant] has done within the past 15 years that was substantial gainful activity, and that lasted long enough for you to learn it."  20 C.F.R. § 416.960(b)(1).   Section 20 C.F.R. § 416.972 defines substantial and gainful work activity.[8]  Plaintiff asserts that she does not have past relevant work as a hand

_____

[6]  The vocational expert used the term "SVP 2." (Tr. 63.)  Specific vocational preparation (SVP) is a term used in the DOT to classify "how long it generally takes to learn the job."  *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990).  The regulations contain definitions for the skill requirements for particular jobs, which are classified as "unskilled," "semi-skilled," and "skilled.  20 C.F.R. §§ 404.1568, 416.968.   Unskilled work corresponds to an SVP of 1-2.  SSR 00-4p, 2000 WL 1898704, at *3.

[7]  Because the vocational expert testified that Plaintiff could perform work as a hand packager "either as the claimant performed it *or* as customarily performed," (Tr. 63) (emphasis), Plaintiff's argument that she performed the job of hand packager in 2003 and 2004 at a higher-than-customary exertional level (Doc. 31 at 2) is of no consequence.

[8]  Substantial gainful activity is work activity that is both substantial and gainful:

(a) Substantial work activity.  Substantial work activity is work activity that involves doing significant physical or mental activities.  Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before.

(b) Gainful work activity.  Gainful work activity is work activity that you do for pay or profit.  Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized.

20 C.F.R. § 416.972.

1   packager because the ALJ found that her work as hand packager in January and February

2   2008 was not substantial gainful activity.  (Doc. 23 at 25; Tr. 15.)

3       However, as the Commissioner notes (Doc. 28 at 11-12), the record also includes

4   evidence that Plaintiff worked as a hand packager from 2003 to 2004.  (Tr. 144, 209.)

5   The vocational expert testified that he reviewed the record and that he was familiar with

6   Plaintiff's vocational history. (Tr. 62.)  Plaintiff has not identified any reason to question

7   the veracity of the vocational expert's testimony.  Additionally, in his step-four analysis,

8   the ALJ noted that the vocational expert reviewed Plaintiff's vocational file and the ALJ

9   specifically cited to the portion of the record that includes evidence of Plaintiff's work as

10  a hand packager from 2003 to 2004.  (Tr. 22 (citing Admin. Hrg. Ex. B14E); Tr. 209).)

11  Thus, it is reasonable to infer that the ALJ considered Plaintiff's work as a hand packager

12  from 2003 to 2004 when making the step-four determination.

13      In her reply, Plaintiff suggests that her work as a hand packager from 2003 to 2004

14  was not "past relevant work" because it was part-time work (four hours per day, five days

15  per week), and thus it was not "substantial gainful activity."  (Doc. 31 at 2.)  However,

16  she does not cite any authority to support a conclusion that part-time work cannot be

17  "substantial gainful activity," and the regulations state that substantial gainful activity

18  may include full or part-time work.  *See Byington v. Chater*, 76 F.3d 246, 248 (9th Cir.

19  1996) (citing 20 C.F.R. § 416.972(a) & (b)).  The SSA authorizes the Commissioner to

20  determine whether work is substantial gainful activity based on the amount of earnings

21  and other factors.[9]  *See Byington*, 76 F.3d at 248 (discussing factors for determining

22  whether services performed or earnings derived from services demonstrate the ability to

23  engage in substantial gainful activity) (citing 42 U.S.C. 423 (d)(4)).

24

25  _____

26      [9]  The Commissioner states that in 2003, the SSA defined substantial earnings as
    at least $800.00 per month.  In 2004, it was $810.00 per month.  (Doc. 28 at 12 n.2 (citing
27  https://secure.ssa.gov/apps10/poms.nsf/lnx/0410501015).)  The Court has confirmed this
    information by visiting the link to review the DI 10501.015 Tables of SGA Earnings
28  Guidelines and Dates Based on Year of Work Activity.  (last visited Sept. 9, 2014).

1    There is a rebuttable presumption that the employee either was or was not engaged
2    in substantial gainful activity if the employee's average monthly earnings are above or
3    below a certain amount established by the Commissioner's Earnings Guidelines.  *Smith v.*
4    *Astrue*, 2012 WL 440826, at *1 (W.D. Wash. Jan. 11, 2012) (citing 20
5    C.F.R. §§ 404.1574(b)(2)-(3), 416.974(b)(2)-(3)).  Plaintiff does not dispute the evidence
6    in the record or the Commissioner's assertion that her work as a hand packager in 2003
7    and 2004 met the requirements for substantial work based on her level of earnings.
8    (Doc. 31 at 2; Tr, 144, 209.)  Accordingly, there was a presumption that Plaintiff's work
9    as a hand packager in 2003 and 2004 was substantial gainful activity and she did not
10   rebut that presumption.  Therefore, the Court finds that the ALJ did not err in finding that
11   Plaintiff had past relevant work as a hand packager.

12   **VII.    Conclusion**

13   As set forth above, the ALJ provided legally sufficient reasons for discounting
14   Plaintiff's credibility, appropriately weighed the medical opinion evidence, and properly
15   found that Plaintiff had past relevant work as a hand packager.  The ALJ's opinion is
16   supported by substantial evidence in the record and any legal errors are harmless.

17   Accordingly,

18   **IT IS ORDERED** that the Commissioner's disability determination in this case is
19   **AFFIRMED**.   The Clerk of Court is directed to enter judgment in favor of the
20   Commissioner and against Plaintiff and to terminate this action.

21   Dated this 9th day of September, 2014.

Bridget S. Bade
United States Magistrate Judge